# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued May 11, 2022         Decided October 11, 2022

No. 21-3089

UNITED STATES OF AMERICA,
APPELLEE

v.

CURTIS JENKINS,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cr-00213-1)

---

*Celia Goetzl*, Assistant Federal Public Defender, argued the cause for appellant. With her on the appellant's Memorandum of Law and Fact was *A.J. Kramer*, Federal Public Defender.

*Kevin Birney*, Assistant U.S. Attorney, argued the cause for appellee. With him on the appellee's Memorandum of Law and Fact were *Chrisellen R. Kolb* and *Nicholas P. Coleman*, Assistant U.S. Attorneys.

Before: KATSAS and WALKER, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

Opinion concurring in part, dissenting in part, and concurring in the judgment filed by *Senior Circuit Judge* GINSBURG.

KATSAS, *Circuit Judge*:  A district court may grant an inmate compassionate release only for "extraordinary and compelling reasons."  18 U.S.C. § 3582(c)(1)(A).  Typically, such reasons involve personal considerations such as the inmate's health, age, or family circumstances.  Section 1B1.13 of the Sentencing Guidelines, which governs motions for compassionate release filed by the Bureau of Prisons, addresses when these considerations become sufficiently "extraordinary and compelling" to warrant compassionate release.

In *United States v. Long*, 997 F.3d 342 (D.C. Cir. 2021), we held that section 1B1.13 does not govern motions for compassionate release filed by the inmate himself.  This case presents the question whether the district courts, in considering such motions, may nonetheless rely on section 1B1.13 and its commentary as persuasive authority.  Following the view of nine sister circuits, we hold that they may.

This case also presents the question whether certain intervening legal changes, occurring after the sentence at issue was imposed, can support compassionate release.  One is a statute that only prospectively reduces penalties for the defendant's offense.  Another is a judicial decision that retroactively establishes legal error at sentencing.  A third is a judicial decision that, if rendered earlier, might have affected the negotiation of a plea bargain by reducing the defendant's exposure.  We hold that none of these changes in sentencing law can support the grant of compassionate release.

3

I

A

Under the former regime of indeterminate sentencing, a prisoner typically became eligible for release on parole after serving the earlier of one third of his sentence or 10 years. 18 U.S.C. § 4205(a) (governing inmates sentenced before 1987). Executive officials had broad discretion to grant or deny parole. *Id.* § 4206(a). In addition, the Bureau of Prisons could at any time and for any reason move in court to reduce the prisoner's sentence to time served. *Id.* § 4205(g).

The Sentencing Reform Act of 1984 abandoned indeterminate sentencing. Pub. L. No. 98-473, tit. II, ch. II, 98 Stat. 1987. The SRA abolished parole, including release under section 4205(g). *Id.* § 218(a)(5), 98 Stat. at 2027. It prohibits modification of a sentence except in three defined circumstances. First, as under the old section 4205(g), the court may reduce a sentence upon motion of the Bureau of Prisons. 18 U.S.C. § 3582(c)(1)(A). This avenue is widely known as compassionate release. Second, the court may modify a sentence "to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure." *Id.* § 3582(c)(1)(B). Third, the court may resentence a defendant if the Sentencing Commission has lowered the applicable guideline range and made the change retroactive. *Id.* § 3582(c)(2).

The SRA imposed three limits on compassionate release that were not present in the old section 4205(g). First, a district court may grant the Bureau's motion only if it finds that "extraordinary and compelling reasons" warrant early release.

18 U.S.C. § 3582(c)(1)(A)(i).[1]  Second, the reduced sentence must be "consistent with applicable policy statements issued by the Sentencing Commission."  18 U.S.C. § 3582(c)(1)(A). Finally, the court may grant relief only "after considering the factors set forth in section 3553(a) to the extent that they are applicable."  *Id.*

The First Step Act of 2018 created a new procedural pathway to compassionate release.  As before, a defendant seeking compassionate release first must ask the BOP to file a motion on his behalf.  Now, if the Bureau refuses, the defendant may file the motion on his own behalf.  Pub. L. No. 115-391, § 602(b)(1), 132 Stat. 5194, 5239 (codified at 18 U.S.C. § 3582(c)(1)(A)).  The First Step Act did not alter the other statutory restrictions on compassionate release, including the requirement of "extraordinary and compelling reasons."

The Sentencing Commission has issued a policy statement about compassionate release, U.S.S.G. § 1B1.13, which it last amended before the passage of the First Step Act. The statement provides that a court may grant compassionate release "[u]pon motion of the Director of the Bureau of Prisons" if "extraordinary and compelling reasons warrant the reduction" and the inmate poses no danger to the safety of any other person.

Application note 1 of the commentary on section 1B1.13 lists three kinds of reasons that the Commission deems extraordinary and compelling: *health*, if the inmate suffers from a terminal illness or other serious condition from which

---

[1]  Congress later permitted release under section 3582(c)(1)(A) for certain elderly defendants sentenced to life imprisonment. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 70002(5), 108 Stat. 1796, 1985 (codified at 18 U.S.C. § 3582(c)(1)(A)(ii)).  That provision is not at issue here.

he is not expected to recover; *age*, if the inmate is over 65, has seriously deteriorating health, and has served 10 years or 75% of his sentence; and *family circumstances*, if the caregiver of the inmate's minor child dies or becomes incapacitated or if the inmate's spouse becomes incapacitated and has no other caregiver. U.S.S.G. § 1B1.13 cmt. n.1(A)–(C). These categories are not exclusive. A reduction may also be warranted if, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with," the listed reasons. *Id.* cmt. n.1(D).

Section 1B1.13 binds courts in cases where it is "applicable." 18 U.S.C. § 3582(c)(1)(A). In *United States v. Long*, 997 F.3d 342 (D.C. Cir. 2021), we held that section 1B1.13 "is not 'applicable' to defendant-filed motions for compassionate release under the First Step Act," because it "applies only to motions … filed by the Bureau of Prisons." *Id.* at 355. The Sentencing Commission lacked a quorum from January 2019 until August 2022, so it has been unable to promulgate a policy statement that applies to such motions.

## B

In November 2016, police conducted a traffic stop of Curtis Jenkins' car. They found a stolen handgun, 11 grams of crack cocaine, and roughly $2,500 in cash. A federal grand jury charged Jenkins with one count of possessing a firearm as a felon, 18 U.S.C. § 922(g); one count of possessing cocaine base with intent to distribute, 21 U.S.C. § 841(a)(1) & (b)(1)(C); and one count of using a firearm during and in relation to a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A). While Jenkins was on release pending trial, he fled after police tried to stop his car a second time. When the police eventually apprehended him, they discovered another gun, 3.5 grams of

crack cocaine, and about $1,500 in cash. The grand jury once again charged Jenkins with the same three offenses, for a total of six counts.

At the time, Jenkins faced long mandatory minimum sentences on the various firearms charges. A section 924(c) offense carries a mandatory minimum sentence of five years' imprisonment, which must run consecutively with any other sentence. 18 U.S.C. § 924(c)(1)(A)(i), (D)(ii) (2018). And section 924(c)'s stacking provision set a mandatory minimum sentence for a second section 924(c) offense at 25 years, even if the defendant had not yet been convicted of the first offense at the time of the second. *Id.* § 924(c)(1)(C)(i) (2012). Additionally, the Armed Career Criminal Act (ACCA) imposes a 15-year mandatory minimum sentence for violating section 922(g) if the defendant has three prior convictions for a "violent felony" or "serious drug offense." *Id.* § 924(e)(1) (2018). Jenkins had two prior convictions for attempted distribution of cocaine and one for assault with a dangerous weapon under D.C. law. At the time, all three convictions arguably qualified as predicate offenses to trigger ACCA. Jenkins thus faced the substantial possibility of a 45-year mandatory minimum sentence, with additional prison time for the two drug charges.

Jenkins and the government entered a plea agreement. Jenkins agreed to plead guilty to one section 924(c) charge and one cocaine possession charge in exchange for dismissal of the remaining four charges. Given Jenkins' prior convictions, the parties agreed that the career offender sentencing guideline, U.S.S.G. § 4B1.1(a), applied. That gave Jenkins a guideline range of about 22 to 27 years. Nonetheless, the parties agreed to recommend a prison term of eight to 12 years. The district court sentenced Jenkins to eight years. As part of the plea deal, Jenkins waived any right to challenge the sentence on direct

appeal or by motion under 28 U.S.C. § 2255, except to the extent such a motion was based on newly discovered evidence or a claim of ineffective assistance of counsel.

Three relevant legal developments then took place. *First*, Congress prospectively narrowed section 924(c)'s stacking provision. Now, its enhanced minimum sentence applies only to offenses committed "after a prior *conviction*" under section 924(c). First Step Act § 403(a), 132 Stat. at 5221–22 (codified at 18 U.S.C. § 924(c)(1)(C)) (emphasis added). But the amendment applies only to defendants who had not yet been sentenced at the time of its enactment. *Id.* § 403(b), 132 Stat. at 5222. Had the change been in place when Jenkins was charged, he would have faced a 10-year rather than a 30-year minimum for the two section 924(c) charges. *Second*, *United States v. Winstead*, 890 F.3d 1082 (D.C. Cir. 2018), held that attempted drug offenses do not trigger the career offender guideline. *Id.* at 1091. Without his prior convictions for attempted distribution, Jenkins would not have been considered a career offender, and his guideline range would have been seven to seven and a half years—well below the guideline range stipulated by the parties, and slightly below the sentence ultimately imposed. *Third*, *Borden v. United States*, 141 S. Ct. 1817 (2021), held that offenses with a minimum *mens rea* of recklessness are not "crimes of violence" under ACCA. *Id.* at 1821–22 (plurality opinion); *id.* at 1835 (Thomas, J., concurring in the judgment). Under D.C. law, recklessness is enough to support a conviction for assault with a dangerous weapon. *Frye v. United States*, 926 A.2d 1085, 1097 (D.C. 2005). Without counting his conviction for that offense, Jenkins would not have faced a 15-year minimum sentence under ACCA.

Jenkins filed a motion for compassionate release. He argued that the narrowed stacking provision, the commission

8

of a *Winstead* error to trigger the career offender guideline, and the pre-*Borden* threat of a 15-year minimum sentence under ACCA were extraordinary and compelling circumstances warranting early release. Jenkins also claimed that he was at heightened risk of COVID-19 due to his borderline obesity, that his elderly mother needed him as a caregiver, and that his adult daughters needed him to be present in their lives.

The district court denied the motion. The court acknowledged that section 1B1.13 "is not binding or exhaustive" but still found it "useful" as "general guidance." ECF Doc. 42, at 8. The court then considered whether Jenkins had "presented information that is similar, or is at least roughly comparable to," the reasons that section 1B1.13 and its commentary identify as extraordinary and compelling. *Id.* at 9. The court further held that the new statute, *Winstead*, and *Borden* were irrelevant because the compassionate-release statute does not permit courts to reexamine the lawfulness or fairness of a sentence as originally imposed. *Id.* at 9–10. That left only Jenkins' health and family circumstances which, the court concluded, did not themselves amount to extraordinary and compelling reasons for early release. *Id.* at 11–13.

II

We review the denial of a motion for compassionate release for abuse of discretion. *Long*, 997 F.3d at 352. An error of law is necessarily an abuse of discretion. *Koon v. United States*, 518 U.S. 81, 100 (1996). Here, the requirement of "extraordinary and compelling reasons" establishes the governing legal standard. Defining its scope—*i.e.*, determining what kind of reasons can be "extraordinary and compelling"—is a legal question that we review *de novo*. *U.S. Bank Nat. Ass'n v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 965 (2018). Whether the facts of a particular case satisfy the

standard is a mixed question that we review deferentially. *See id.* at 966–67.

## III

Jenkins first takes aim at the district court's reliance on section 1B1.13 and its commentary. He claims the court treated them as binding despite *Long*'s holding that section 1B1.13 does not apply to defendant-filed motions. Alternatively, he argues that it was error to rely on the administrative materials even as persuasive authority.

## A

The district court did not consider itself bound by section 1B1.13. Citing *Long*, it stated that section 1B1.13 "is not binding or exhaustive." ECF Doc. 42, at 8. To be sure, the court did frame its discussion in terms of whether Jenkins had presented reasons comparable to the ones listed in section 1B1.13 and its commentary. But courts do not treat Sentencing Commission guidance as controlling when they rely on it only as the "starting point and … initial benchmark" of their analysis. *Gall v. United States*, 552 U.S. 38, 49 (2007).

Jenkins cites *United States v. Johnson*, 858 F. App'x 381 (D.C. Cir. 2021), which vacated the denial of a defendant-filed motion for compassionate release. There, the district court asserted that extraordinary and compelling reasons were "circumstances defined in the Guidelines." *Id.* at 383 (cleaned up). We held that the court had erroneously "consider[ed] itself bound by the policy statement." *Id.* In contrast, the district court here was explicit that section 1B1.13 did not control its decision.

B

The district court appropriately considered the Sentencing Commission's guidance. Although not formally controlling, the guidance interprets a statutory requirement common to both BOP-filed and defendant-filed motions. Courts may consider nonbinding agency interpretations of statutes to be persuasive authority. *Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944). The level of weight such an interpretation carries "var[ies] with circumstances," including "the degree of the agency's care, its consistency, formality, and relative expertness." *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (cleaned up). Given these considerations, the district court reasonably invoked the guidance.

To begin, the guidance is formal. The Sentencing Commission has published it in the *Guidelines Manual* and framed it as general guidance of nationwide scope. The guidance also reflects an exercise of the Commission's rulemaking authority, which formally binds courts in cases where it applies. 18 U.S.C. § 3582(c)(1)(A); 28 U.S.C. § 994(t). Likewise, the commentary is binding to the extent that it reasonably interprets the policy statement. *Stinson v. United States*, 508 U.S. 36, 44–45 (1993).

The guidance also falls within the Sentencing Commission's expertise. Congress has charged the Commission with setting forth "what should be considered extraordinary and compelling reasons" for compassionate release. 28 U.S.C. § 994(t). And the guidance reflects a careful exercise of that responsibility. The Commission adopted the current version of application note 1 after "an in-depth review" that included BOP data on compassionate-release applications, two reports from the Department of Justice Office of Inspector General, and a public hearing. U.S. Sentencing Comm'n,

*Guidelines Manual: Supplement to Appendix C*, amend. 799, at 127 (2021). The Commission also explained in detail how the facts it found led to its specific guidance. *Id.* at 127–28.

Finally, the Sentencing Commission's guidance has been consistent over time. The Commission first construed the "extraordinary and compelling reasons" language in 2007. Then, it listed three kinds of qualifying reasons—health, age, and family circumstances—and acknowledged that other reasons may also suffice. 3 U.S. Sentencing Comm'n, *Guidelines Manual: Appendix C*, amend. 698, at 186 (2011). Application note 1 retains this basic structure. The only change has been to elaborate further on each category.

Given these considerations, the district court permissibly relied on section 1B1.13 and its commentary to inform the exercise of its discretion. As nine other circuits have held, courts may consider these materials even in cases involving defendant-filed motions for compassionate release. *E.g.*, *United States v. Ruvalcaba*, 26 F.4th 14, 23 (1st Cir. 2022); *United States v. Andrews*, 12 F.4th 255, 260 (3d Cir. 2021); *United States v. McCoy*, 981 F.3d 271, 282 n.7 (4th Cir. 2020); *United States v. Thompson*, 984 F.3d 431, 433 (5th Cir. 2021); *United States v. Tomes*, 990 F.3d 500, 503 n.1 (6th Cir. 2021); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020); *United States v. Marcussen*, 15 F.4th 855, 859 (8th Cir. 2021); *United States v. Aruda*, 993 F.3d 797, 802 (9th Cir. 2021); *United States v. Hald*, 8 F.4th 932, 938 n.4 (10th Cir. 2021).

Jenkins' contrary arguments are unconvincing. Citing *Long*, Jenkins first contends that the guidance is unpersuasive because it "does not reflect any … policy judgment … about how compassionate release decisions should be made under the First Step Act," which "deliberately broadened its availability." 997 F.3d at 359. But the Act's sole change was to create a new procedural avenue for relief. It did not alter the extraordinary-

and-compelling-reasons standard, so it did not undermine the Commission's interpretation of that standard. And in *Long*, we held only that section 1B1.13 is not formally "applicable" to defendant-filed motions, so its guidance is not legally binding. *Id.* at 347. We had no occasion to consider, and we did not consider, the distinct question whether courts may rely on it as persuasive authority.

Jenkins next claims that application note 1 unreasonably limits "extraordinary and compelling reasons" to specific circumstances related to the defendant's health, age, and family situation. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)–(C). Jenkins overlooks the note's catchall provision, which states that a "reason other than, or in combination with," the listed circumstances may be extraordinary and compelling. *Id.* cmt. n.1(D). Admittedly, paragraph (D) also requires that any unenumerated reason be raised by the BOP. *Id.* But the district court properly looked beyond that requirement in the context of a defendant-filed motion, instead asking whether *Jenkins* had presented any reasons "at least roughly comparable" to the ones enumerated in the guidance. ECF Doc. 42, at 9.

Finally, Jenkins argues that courts should give no weight to application note 1 because it interprets a policy statement that merely parrots the governing statute. As a general matter, we defer to the Sentencing Commission's official commentary because it is analogous to an agency's interpretation of its own regulations. *Stinson*, 508 U.S. at 44–45; *see Kisor v. Wilkie*, 139 S. Ct. 2400 (2019); *Auer v. Robbins*, 519 U.S. 452 (1997). But we do not extend *Auer* deference when the regulation being interpreted "does little more than restate the terms of the statute itself." *Gonzales v. Oregon*, 546 U.S. 243, 257 (2006). Here, section 1B1.13(1)(A) merely repeats verbatim the statutory requirement of "extraordinary and compelling reasons." Thus,

Jenkins maintains, under the analogy of policy statements to regulations, application note 1 is entitled to no deference.

We need not decide whether Jenkins is correct on this point. Even when the parroting exception to *Auer* applies, an agency's interpretation of language common to the statute and regulation still may receive *Skidmore* deference. *Gonzales*, 546 U.S. at 268–69. For *Skidmore* purposes, the only difference between section 1B1.13 itself and application note 1 is that the policy statement is somewhat more formal. This does not undermine our overall conclusion that the district courts may permissibly rely on the Commission's interpretation as persuasive, for all the reasons noted above.

IV

We next consider Jenkins' arguments based on the stacking amendment, *Winstead*, and *Borden*. The district court held that such intervening changes in sentencing law cannot warrant compassionate release. Jenkins objects that this holding is atextual. Congress has directed that "[r]ehabilitation of the defendant alone" may "not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). But otherwise, Jenkins contends, Congress has placed no limits on what reasons a court may consider in deciding whether to grant compassionate release.

We disagree, for the proffered reasons must be "extraordinary and compelling." 18 U.S.C. § 3582(c)(1)(A). An "extraordinary" reason must be "'most unusual,' 'far from common,' and 'having little or no precedent.'" *United States v. Hunter*, 12 F.4th 555, 562 (6th Cir. 2021) (quoting *Webster's Third New International Dictionary: Unabridged* 807 (1971)). And a "compelling" reason must be "both powerful and convincing." *United States v. Canales-Ramos*, 19 F.4th 561, 567 (1st Cir. 2021) (citing *Webster's Third*, *supra*, at 462).

Applying these requirements, we agree with the district court that Jenkins' three asserted grounds are neither extraordinary nor compelling, whether considered in isolation or in combination with other factors.

A

Start with the stacking provision. The First Step Act eliminated the 25-year minimum sentence for a second section 924(c) offense if the defendant had not yet been convicted of the first offense at the time of the second. Pub. L. No. 115-391, § 403(a), 132 Stat. at 5221–22. Although the amendment applies only prospectively to defendants sentenced after the date of its enactment, *id.* § 403(b), 132 Stat. at 5222, Jenkins claims that courts may nonetheless consider it in deciding whether to grant compassionate release to defendants previously sentenced under the unamended provision.

The circuits have split on whether courts may consider such intervening but expressly nonretroactive sentencing statutes. Three circuits have held that such statutes may neither support nor contribute to a finding that extraordinary and compelling reasons warrant compassionate release. *United States v. Crandall*, 25 F.4th 582, 586 (8th Cir. 2022); *Andrews*, 12 F.4th at 261 (3d Cir.); *United States v. Thacker*, 4 F.4th 569, 574 (7th Cir. 2021). Four circuits have held that such statutes may be considered in connection with other factors. *United States v. Chen*, No. 20-50333, 2022 WL 4231313, at *5 (9th Cir. Sept. 14, 2022); *Ruvalcaba*, 26 F.4th at 28 (1st Cir.); *United States v. McGee*, 992 F.3d 1035, 1047–48 (10th Cir. 2021); *McCoy*, 981 F.3d at 286 (4th Cir.); The Sixth Circuit is internally split on the issue. *Compare United States v. McKinnie*, 24 F.4th 583, 588 (6th Cir. 2022), *with United States v. McCall*, 20 F.4th 1108, 1114 (6th Cir. 2021), *reh'g en banc granted, opinion vacated*, 29 F.4th 816 (6th Cir. 2022) (mem.).

We agree with the Third, Seventh, and Eighth Circuits. To begin, there is nothing remotely extraordinary about statutes applying only prospectively. In fact, there is a strong presumption against statutory retroactivity, which is "deeply rooted in our jurisprudence" and "embodies a legal doctrine older than our Republic." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994). The Ex Post Facto Clause compels the purely prospective application of criminal statutes that are unfavorable to defendants. U.S. Const. art. 1, § 9, cl. 3. And since 1871, federal law has codified the presumption against retroactivity for statutes making criminal law *more* favorable to defendants. Thus, a statute reducing the penalties for a criminal offense—or even repealing the offense entirely—does not apply to offenses committed prior to its enactment, "unless the repealing Act shall so expressly provide." 1 U.S.C. § 109; *see Dorsey v. United States*, 567 U.S. 260, 273–75 (2012). The SRA imposes its own prospectivity rule for sentencing guidelines, by instructing courts to consider the guidelines "in effect on the date the defendant is sentenced." 18 U.S.C. § 3553(a)(4)(A)(ii). Thus, "in federal sentencing the ordinary practice is to apply new [lower] penalties to defendants not yet sentenced, while withholding that change from defendants already sentenced." *Dorsey*, 567 U.S. at 280. And what "the Supreme Court views as the 'ordinary practice' cannot also be an 'extraordinary … reason' to deviate from that practice." *United States v. Wills*, 997 F.3d 685, 688 (6th Cir. 2021). Nor can such a settled, common practice be a compelling reason to deviate.

Separation-of-powers considerations reinforce this analysis. "It is the legislature, not the Court, which is to define a crime, and ordain its punishment." *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820). When Congress enacted the original stacking provision, it deemed a 25-year minimum sentence to be appropriate for all second section

924(c) offenses. 18 U.S.C. § 924(c)(1)(C)(i) (2012). And by making its ameliorative amendment expressly nonretroactive, First Step Act § 403(b), 132 Stat. at 5222, Congress reaffirmed that the 25-year minimum remained appropriate for defendants already sentenced. We would usurp these quintessentially legislative judgments if we used compassionate release as a vehicle for applying the amendment retroactively, to previously sentenced defendants who would not otherwise qualify for compassionate release. As the Seventh Circuit explained, we cannot allow the "general" and "discretionary" authority conferred by the compassionate-release statute "to upend the clear and precise limitation Congress imposed on the effective date of the First Step Act's amendment to § 924(c)." *Thacker*, 4 F.4th at 574. Here as elsewhere, courts must exercise their discretion consistent with all applicable statutory constraints. *See*, *e.g.*, *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 139 (2005) ("Discretion is not whim."); *INS v. Pangilinan*, 486 U.S. 875, 883 (1988) ("courts of equity can no more disregard statutory and constitutional requirements … than can courts of law" (cleaned up)).

Courts reaching the contrary conclusion have reasoned that there is a significant difference between making an intervening statute "categorically retroactive"—which all agree Congress did not do here—and considering a purely prospective statute as one relevant factor in an "individualized" compassionate-release inquiry. *McCoy*, 981 F.3d at 286. Making the statute retroactive would require "automatic vacatur" of all past sentences to which the statute applied. *Id.* In contrast, considering an intervening statute would merely "allow[] for the provision of individual relief in the most grievous cases." *Id.* at 287 (cleaned up). For this reason, the concurrence concludes that we have committed a "Fallacy of Division" by "assuming what is true of the whole must be true of each part." *Post* at 2.

The difficulty with this view is that the disputed considerations do not vary from case to case—one might say that they are not divisible. The Fourth Circuit would have courts consider two assertedly "distinct features" of cases involving defendants sentenced under the unamended stacking provision—the "sheer and unusual length" of the 25-year mandatory minimum and the "gross disparity" between that provision and the five-year mandatory minimum that would have applied had the amendment been made retroactive. *See McCoy*, 981 F.3d at 285–86. Likewise, the concurrence would have courts consider "a societal decision that the conduct for which the prisoner was convicted incurs less moral opprobrium than it previously had." *Post* at 3. Such reasoning *always* runs headlong into Congress's judgment that the unamended statute remains appropriate for previously sentenced defendants, which is why even courts on the *McCoy* side of the split recognize that a court may *never* grant compassionate release based solely on prospective sentencing changes. *See*, *e.g.*, *Ruvalcaba*, 26 F.4th at 27 ("if a district court were to reduce a sentence solely because one of [a statute's] non-retroactive amendments would have lowered a defendant's sentence, it might be seen as substituting its own judgment on retroactivity for Congress's judgment"); *id.* at 32 (Barron, J., concurring) ("the premise of our holding is not that a nonretroactive legal change in and of itself can provide the 'extraordinary and compelling reason' to reduce the sentence"). Of course, courts still may consider individualized factors such as "the defendants' relative youth at the time of their offenses, their post-sentencing conduct and rehabilitation, and the very substantial terms of imprisonment they already served." *McCoy*, 981 F.3d at 288. But if those considerations do not themselves warrant compassionate release, we should not tip the balance by allowing courts to question whether the original

mandatory minimum sentence was simply too long, either in absolute terms or relative to the amendment.  As Chief Judge Sutton nicely summed up, "adding a legally impermissible ground to three insufficient factual considerations does not entitle a defendant to a sentence reduction."  *United States v. Jarvis*, 999 F.3d 442, 444 (6th Cir. 2021).

Our analysis is consistent with the Supreme Court's recent decision in *Concepcion v. United States*, 142 S. Ct. 2389 (2022).  That case involved section 404 of the First Step Act, which authorizes district courts to reduce sentences for certain offenses involving crack cocaine.  The Supreme Court held that the district courts, in deciding whether to do so, may consider "intervening changes of law or fact."  *Id.* at 2404.  The Court reasoned that a court may "consider any relevant materials" for sentencing, except as limited by statute or the Constitution.  *Id.* at 2400.  As explained above, the compassionate-release statute imposes just such a limit, in authorizing a reduced term of imprisonment only for extraordinary and compelling reasons.  Moreover, *Concepcion* "mentioned the compassionate-release statute only to support the proposition that Congress knows how to limit which considerations may be used to reduce a sentence"—an observation that "undermines rather than helps" the position urged here by Jenkins.  *United States v. King*, 40 F.4th 594, 596 (7th Cir. 2022) (holding that *Thacker* survives *Concepcion*); *see also United States v. Bledsoe*, No. 22-2022, 2022 WL 3536493, at *2 (3d Cir. Aug. 18, 2022) (holding that *Andrews* survives *Concepcion*).

B

We now turn to *Winstead*, under which Jenkins should not have been classified as a career offender.  As a "judicial construction" of the career offender guideline, *Winstead* establishes what that guideline meant "before as well as after"

the date it was decided. *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 312–13 (1994). *Winstead* thus establishes that the district court miscalculated Jenkins' guideline range. But given the availability of direct appeal and collateral review under section 2255 of title 28, we conclude that legal errors at sentencing—including those established by the retroactive application of intervening judicial decisions—cannot support a grant of compassionate release. And even if they otherwise could, the habeas-channeling rule of *Preiser v. Rodriguez*, 411 U.S. 475 (1973), would bar their consideration outside the context of direct appeals or collateral review under section 2255.

1

Legal errors at sentencing are neither extraordinary nor compelling. When they occur, they may be corrected on direct review, including through the retroactive application of intervening judicial decisions. *Griffith v. Kentucky*, 479 U.S. 314 (1987). Sentencing errors may also sometimes be corrected on collateral review under section 2255. But because collateral review significantly undermines the government's important interest in finality, Congress and the Supreme Court have established many procedural rules limiting the availability of such relief, including for errors made clear by intervening judicial decisions. They have also established many exceptions to these limitations, reflecting a careful balance between the government's interest in finality and the defendant's interest in obtaining relief from an unlawful sentence. The relevant doctrines include retroactivity limits and exceptions, *Teague v. Lane*, 489 U.S. 288, 311–12 (1989) (plurality opinion); procedural-default rules and exceptions, *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977); a statute of limitations and exceptions, 28 U.S.C. § 2255(f); and a bar on successive or abusive motions and exceptions, *id.* § 2255(h). Congress "does not alter the fundamental details of a regulatory scheme in vague

terms." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). We must therefore interpret the compassionate-release statute in light of this reticulated scheme for collateral review, rather than invoke compassionate release to end-run its limits. Thus, even if procedural hurdles would now prevent Jenkins from raising his sentencing argument in collateral proceedings, we cannot treat such a bar on relief under section 2255 as supporting a finding of extraordinary and compelling circumstances. As the Seventh Circuit explained: "There's nothing 'extraordinary' about new statutes *or caselaw* … ; these are the ordinary business of the legal system, and their consequences should be addressed by direct appeal or collateral review under 28 U.S.C. § 2255." *King*, 40 F.4th at 595 (emphasis added).

Treating sentencing errors as cognizable would also bring the compassionate-release statute into conflict with other provisions of the Sentencing Reform Act. As explained above, the SRA enacted section 3582(c)(1)(B) of Title 18, which permits a district court to "modify an imposed term of imprisonment to the extent otherwise expressly permitted … by Rule 35 of the Federal Rules of Criminal Procedure." At the same time, the SRA substantially narrowed the district courts' ability to modify illegal sentences under Rule 35. Before the SRA was enacted, Rule 35 allowed the district courts to "correct an illegal sentence at any time." Fed. R. Crim. P. 35(a) (1984). But the SRA amended Rule 35 to permit sentence modifications in only two narrow circumstances— (a) on remand from a court of appeals, or (b) to reflect a defendant's substantial assistance to the government, upon a government motion filed within one year of the sentence. Pub. L. No. 98-473, § 215(b), 98 Stat. at 2015–16. Rule 35 is now only slightly broader: It also allows district courts to correct "a sentence that resulted from arithmetic, technical, or other clear error" within 14 days of sentencing. Fed. R. Crim. P.

35(a) (2021). These post-SRA rules are far stricter than their civil counterpart, which permits district courts to grant relief from a judgment for a "mistake," including a court's error of law, "within a reasonable time" of up to one year. Fed. R. Civ. P. 60(b)(1), (c)(1); *see Kemp v. United States*, 142 S. Ct. 1856, 1861–62 (2022).

As this history indicates, Congress made a conscious judgment, which Rule 35 still reflects, that a district court's authority to correct its own sentencing errors should be "very narrow." Fed. R. Crim. P. 35 advisory committee's note to 1991 amendment. The Rule's narrow terms do not "raise doubts about the finality of determinate sentencing" that the Sentencing Reform Act "attempted to resolve." *Id.* But using compassionate release to correct sentencing errors would blow open these carefully crafted limits, violating the cardinal principle that "specific statutory language should control more general language when there is a conflict between the two." *Nat'l Cable & Telecomms. Ass'n v. Gulf Power Co.*, 534 U.S. 327, 335 (2002).

As with intervening prospective statutes, it is no answer to say that intervening judicial decisions may be considered only as one factor among many, to be invoked only sparingly. For one thing, because courts cannot pick needles from haystacks *ex ante*, finality would be undermined whenever any judicial decision, rendered any time after a sentence has become final on direct review, at least arguably calls the sentence into question. For another, judges would have widely divergent views about when such decisions, considered only sometimes and combined somehow with other factors, rise to the level of an "extraordinary and compelling reason" for early release. We doubt that the SRA—which effected a profound shift from indeterminate to determinate sentencing—contained these seeds of its own destruction. Finally, if an intervening judicial

decision by itself could never support compassionate release, we fail to see how such a "legally impermissible" consideration could do so when combined with other "insufficient factual considerations." *Jarvis*, 999 F.3d at 444.

Jenkins claims that *Johnson* recognized *Winstead* errors as cognizable on compassionate release. It did not. As discussed above, the district court in *Johnson* erred in "considering itself bound" by section 1B1.13 in a case involving a defendant-filed motion. 858 F. App'x at 383. We determined that this error was not harmless because the defendant had raised a *Winstead* claim which did not fall within the grounds for compassionate release recognized by the Sentencing Commission. *Id.* at 384. But we did not affirmatively hold that a *Winstead* error could support compassionate release. Rather than decide that question, we remanded for the district court to consider it in the first instance. *Id.*

2

The habeas-channeling rule of *Preiser* independently forecloses using compassionate release to correct sentencing errors. The writ of habeas corpus—including section 2255, the habeas substitute for federal prisoners—traditionally "has been accepted as the specific instrument to obtain release from [unlawful] confinement." *Preiser*, 411 U.S. at 486. As a result, an inmate may not rely on a generally worded statute to attack the lawfulness of his imprisonment, even if the terms of the statute literally apply. *Id.* at 489. This includes both direct attacks seeking "an injunction compelling speedier release" and indirect attacks seeking "a judicial determination that necessarily implies the unlawfulness of the State's custody." *Wilkinson v. Dotson*, 544 U.S. 74, 81 (2005).

Jenkins' assertion of *Winstead* error amounts to just such an attack on the lawfulness of his sentence. For a court to grant

compassionate release based on alleged *Winstead* error, it would have to conclude that there in fact was *Winstead* error, which would imply the invalidity of the sentence as originally imposed.  Because that is precisely what the habeas-channeling rule forbids, we join the circuits holding that defendants cannot seek compassionate release based on legal errors at sentencing, including errors made clear through the retroactive application of intervening precedent.  *King*, 40 F.4th at 595–96 (7th Cir.); *Crandall*, 25 F.4th at 586 (8th Cir.); *Hunter*, 12 F.4th at 567–68 (6th Cir.); *United States v. Mata-Soto*, 861 F. App'x 251, 255 (10th Cir. 2021); *United States v. Henderson*, 858 F. App'x 466, 469 (3d Cir. 2021).  Jenkins cites no circuit precedent to the contrary, and we have not found any.

The arguments Jenkins does make are unpersuasive.  *First*, he claims that the government forfeited reliance on the habeas-channeling rule by failing to raise it in its memorandum on appeal.  But as the appellee here, the government was not even required to file a brief, *see* Fed. R. App. P. 31(c), much less to take affirmative steps to preserve a ground for affirmance laid out in the decision under review.  In any event, the government did argue that "appellant's remedy" for his *Winstead* claim "is to file a motion pursuant to 28 U.S.C. § 2255" rather than one for compassionate release, and it collected cases from other circuits holding as much.  Appellee's Mem. at 21–22.[2]

---

[2]  In his supplemental brief, Jenkins also argues that the government failed to raise the habeas-channeling rule below.  This objection is itself forfeited:  Although the government raised the habeas-channeling rule in its memorandum on appeal, Jenkins did not object in his reply memorandum that the government had forfeited this point below.  *See Ass'n of Am. R.Rs. v. DOT*, 821 F.3d 19, 25–26 (D.C. Cir. 2016); Reply Mem. at 10–11.  In addition, the district court rejected Jenkins' *Winstead* argument on the ground that

*Second*, Jenkins asserts that the habeas-channeling rule governs only suits under 42 U.S.C. § 1983 or at least civil suits generally. But we have applied the rule outside of section 1983 actions. *See*, *e.g.*, *Skinner v. DOJ*, 584 F.3d 1093, 1099 (D.C. Cir. 2009) (Privacy Act). Likewise, the civil-criminal distinction is irrelevant, for the habeas-channeling rule simply reflects the elementary principle that specific statutes qualify general ones. *Preiser*, 411 U.S. at 489. After a conviction has become final on direct review, habeas corpus is "*the* specific instrument" for challenging assertedly unlawful confinement. *Id.* at 486 (emphasis added). And as explained above, it contains a bevy of retroactivity, procedural default, statute of limitations, and successiveness rules specifically designed to balance the competing interests in finality and error correction. Measured in terms of "relative specificity" to habeas, *post* at 11, the compassionate-release statute is not distinguishable from section 1983.

The concurrence seeks to distinguish the compassionate-release statute as one "expressly designed to give judges the discretion to modify sentences." *Post* at 13. But regardless of whether the statute literally extends to claims of sentencing error established by intervening precedents, such claims are hardly at its core. Most obviously, the compassionate-release statute covers factors like those enumerated by the Sentencing Commission—health, age, and family circumstances—which turn on *post*-sentencing changes to a prisoner's individual situation, not on legal errors at sentencing. Thus, applying the habeas-channeling rule to the compassionate-release statute still gives the latter a broad range of meaningful application,

---

"the compassionate release statute was not intended to serve as a second chance to address a defendant's sentence." ECF Doc. 42, at 10. That assertion—which fairly includes the points we address here—teed the issue up in this court, for Jenkins makes no argument that the district court abused its discretion in reaching it.

just as applying the habeas-channeling rule to section 1983, a statute expressly designed to provide redress for constitutional violations, still gives that statute a broad range of meaningful application.

*Third*, Jenkins reasons that because a grant of compassionate release is discretionary, establishing legal error at sentencing would not necessarily shorten his sentence. But the habeas-channeling rule applies so long as "success in [the inmate's] action would necessarily demonstrate the invalidity of confinement or its duration." *Wilkinson*, 544 U.S. at 82; *see Edwards v. Balisok*, 520 U.S. 641, 648 (1997). And for Jenkins to prevail on his *Winstead* claim, the court would necessarily have to conclude that his sentence was unlawfully imposed. Otherwise, what could possibly be extraordinary and compelling about an intervening judicial decision confirming that a sentence was lawfully imposed, or simply not resolving the question one way or the other? In sum, Jenkins highlights that under his theory, establishing legal error at sentencing would not be *sufficient* to warrant compassionate release. But under *Preiser*, what matters is that establishing legal error at sentencing would be *necessary* to granting compassionate release based on an intervening judicial decision.

*Fourth*, Jenkins invokes *Davis v. U.S. Sentencing Commission*, 716 F.3d 660 (D.C. Cir. 2013). That case involved an equal-protection challenge to an amendment retroactively lowering the guideline range for certain low-volume drug offenses, but not for higher-volume offenses. *Id.* at 661. We held the suit did not implicate the habeas-channeling rule because "success on the merits" would not "necessarily imply the invalidity of confinement or shorten its duration." *Id.* at 666 (cleaned up). That was so because the promulgation of a guideline with retroactive effect does not invalidate earlier sentences as originally imposed, but merely

allows the affected inmates "to seek discretionary sentence reductions." *Id.* at 662. In contrast, a sentence issued after a guideline calculation error is unlawfully imposed and subject to vacatur on appeal unless the error was harmless. *See Gall*, 552 U.S. at 51.

One final point: The concurrence observes that *Winstead* may not satisfy the *Teague* requirements for retroactive application on habeas. *Post* at 12–13. Based on that premise, the concurrence treats *Winstead* as no different from an intervening "legislative change." *Post* at 12. In our view, this account misunderstands how judicial decisions work. *See*, *e.g., Rivers*, 511 U.S. at 312 (judicial decisions establish what the law meant from date of enactment); *Crandall*, 25 F.4th at 586 (intervening judicial decision "did not change the law; it was an interpretation of existing law"). But if the concurrence were correct on this point, that would simply make Jenkins' argument based on *Winstead* "conceptually the same" as his argument based on the stacking amendment. *Post* at 12. If so, then both arguments would fail for reasons explained above.

C

Finally, we address the argument based on *Borden*, which establishes that Jenkins could not have received a 15-year mandatory minimum under ACCA for his felon-in-possession offenses. According to Jenkins, the possibility of such a sentence pressured him to accept a less favorable plea deal than he otherwise would have, and that is an extraordinary and compelling reason for compassionate release.

To the extent Jenkins claims that his guilty plea was involuntary, he mounts a due process challenge to the conviction itself, *see McCarthy v. United States*, 394 U.S. 459, 466 (1969), which is subject to the habeas-channeling rule. The challenge is also foreclosed by *Brady v. United States*, 397

U.S. 742 (1970), which held that a guilty plea does not become invalid simply because "later pronouncements of the courts … hold that the maximum penalty for the crime in question was less than was reasonably assumed at the time the plea was entered." *Id.* at 757.

To the extent Jenkins claims that his sentence, although lawful, is harsher than it otherwise would have been, there is nothing extraordinary about that. Of course, plea bargaining is ubiquitous in the criminal justice system. *See Missouri v. Frye*, 566 U.S. 134, 144 (2012). And baked into the notion of plea bargaining is that *both* parties forgo potentially meritorious arguments to obtain a more certain, second-best result. The defendant gives up his chance at acquittal, but he gains the substantial likelihood of receiving a lower sentence than the one he would have received had he been convicted at trial. *Brady*, 397 U.S. at 751–52. The government forgoes pursuing the maximum punishment available, but it gains the certainty of a conviction and saves the time and expense of preparing for trial. *Id.* at 752. In such a bargain, there is nothing unusual about later decisions revealing which party would have prevailed had the open issues been contested. *See McMann v. Richardson*, 397 U.S. 759, 770 (1970).

Other considerations reinforce this analysis. For one thing, to plead guilty, the defendant must affirmatively waive any claim that the agreed-to sentence is legally or factually inappropriate. *See* Fed. R. Crim P. 11(b). To grant early release despite such a waiver, based on an intervening decision suggesting that the defendant made a bad deal, would violate the bedrock principle that even the "most basic rights of criminal defendants" are waivable, *Peretz v. United States*, 501 U.S. 923, 936 (1991), and courts cannot grant relief based on waived rights, *United States v. Olano*, 507 U.S. 725, 732–33 (1993). It would also deprive the government of the benefits

for which it bargained—a guaranteed minimum level of punishment without the risks and expense of trial. And if the government cannot reliably obtain the benefit of its bargain, then it will have less incentive to enter plea bargains in the first place, making both itself and criminal defendants worse off in the long run. *See Frye*, 566 U.S. at 144; *Mabry v. Johnson*, 467 U.S. 504, 508 (1984); *Brady*, 397 U.S. at 752.

D

The structure and history of the compassionate-release statute reinforce our conclusion that the post-sentencing legal changes discussed above are irrelevant to the question whether extraordinary and compelling circumstances warrant early release.

Consider the statutory exhaustion requirement. It requires a defendant first to ask BOP to file a compassionate-release motion on his behalf. 18 U.S.C. § 3582(c)(1)(A). If the Bureau denies the request, the defendant then must exhaust all administrative appeal rights within BOP, unless the Bureau fails to act timely. *Id.*

Exhaustion requirements allow the agency "to apply its special expertise" and to "produce a useful record for subsequent judicial consideration." *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992). We should expect, then, that the extraordinary-and-compelling-reasons inquiry is one that the BOP is well suited—or at least institutionally competent—to make. The Bureau is charged with holding federal prisoners and preparing them for release. 18 U.S.C. § 4042(a). That makes it well suited to evaluate the kinds of circumstances the Sentencing Commission has identified—an inmate's age, health, and family circumstances. But the BOP plays no role in plea bargaining, calculating guideline ranges, or determining the lawfulness of individual sentences. Within the Department

of Justice, that is the province of the United States Attorneys, who represent the government at sentencing. 28 U.S.C. § 547(1); DOJ, *Justice Manual* § 9-27.730 (2018). If Jenkins' asserted grounds for release were cognizable, the compassionate-release statute would require the BOP to make thousands of determinations every year in areas well beyond its core mission and expertise.

Jenkins' reading is also at odds with the concept of *compassionate* release. When "pertaining to allowances, leave, etc.," "compassionate" means "[g]ranted out of compassion, without legal or other obligation." *Compassionate*, *Oxford English Dictionary* (2d ed. 1989); *see*, *e.g.*, *Compassionate*, *Webster's Ninth New Collegiate Dictionary* (1990) ("granted because of unusual distressing circumstances affecting an individual"); *Thomas v. Farley*, 31 F.3d 557, 558–59 (7th Cir. 1994) (inmate sought "compassionate leave" "to attend his mother's funeral"); *Gwin v. Snow*, 870 F.2d 616, 618 (11th Cir. 1989) (inmate sought "compassionate leave when his mother died"); *United States v. Lawson*, 39 C.M.R. 726, 727–28 (1968) (soldier given "compassionate leave" because of "problems at home"); *cf. Compassionate Leave*, *Cambridge Business English Dictionary* (2011) ("paid time off work that someone is allowed to have because a member of their family has died, or because they have a serious personal problem").

Statutes authorizing "compassionate release" thus typically permit release only for age, health, family, and similar *personal* circumstances. *See*, *e.g.*, D.C. Code § 24-403.04(a) (age, medical condition, family circumstances); Ill. Stat. Ch. 730 § 5/3-3-14(b) (medical condition); Mich. Comp. L. § 771.3h(1) (same); N.J. Stat. § 30:4-123.51e(f)(1) (same); *see also Compassionate Release*, *Black's Law Dictionary* (11th ed. 2019) (equating the term with "medical parole"). In contrast,

Jenkins seeks release based on changes in the *legal* landscape, which are not ordinarily cognizable under such statutes.

Jenkins objects that section 3582(c)(1)(A) does not itself use the name "compassionate release." True enough, but the phrase nonetheless has interpretive significance.

The government bodies charged with implementing section 3582(c)(1)(A) consistently have described it as a mechanism for "compassionate release." The BOP's first regulations implementing the statute used that term. *See* Control, Custody, Care, Treatment and Instruction of Inmates; Compassionate Release, 59 Fed. Reg. 1238 (Jan. 7, 1994). So do less formal BOP guidance documents. *See* Memorandum of Kathleen M. Hawk, Director, BOP, to Executive Staff (July 22, 1994), *reprinted in* DOJ, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program*, No. I-2013-006, at 67, 67 (2013) (BOP "has historically taken a conservative approach to filing a motion with the courts for the compassionate release of an inmate under … § 3582(c)(1)(A)"). The Sentencing Commission and the DOJ Office of the Inspector General also use the term "compassionate release" to refer to section 3582(c)(1)(A). *Guidelines Manual: Supplement to Appendix C*, *supra*, amend. 799, at 126; Office of the Inspector General, *supra*, at i n.3. So do courts and litigants. *See*, *e.g.*, *United States v. Jackson*, 26 F.4th 994, 996 (D.C. Cir. 2022); *Long*, 997 F.3d at 347. It is hard to see how the name "compassionate release" could gain such universal and unquestioned acceptance absent a shared understanding that section 3582(c)(1)(A) concerns compassionate grounds for release.

In the First Step Act, Congress itself used "Compassionate Release" to refer to section 3582(c)(1)(A). Pub. L. No. 115-391, § 603(b), 132 Stat. at 5239. Like a statutory title or section

heading, this name is "a short-hand reference to the general subject matter involved," and so may be relied upon to "shed light" on it. *Brotherhood of R.R. Trainmen v. Balt. & Ohio R.R.*, 331 U.S. 519, 528–29 (1947); *see* A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 221 (2012). And because the First Step Act amends section 3582(c)(1)(A), the two should be read *in pari materia*. *See*, *e.g.*, *United States v. Stewart*, 311 U.S. 60, 64 (1940); Scalia & Garner, *supra*, at 254–55.

Finally, Jenkins' reading is inconsistent with Sentencing Commission commentary, which is binding for BOP-filed motions and at least persuasive here. As explained above, that commentary flags considerations such as a defendant's health, age, and need to care for family members. U.S.S.G. § 1B1.13 cmt. n.1(A)–(C). The commentary also states that a "reason other than, or in combination with, the reasons" specifically identified may also qualify. *Id.* cmt. n.1(D). Under the canon of *ejusdem generis*, this catchall provision "embrace[s] only objects similar in nature to those objects enumerated by the preceding specific words." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15 (2001) (cleaned up). That would include other kinds of sympathetic personal circumstances, but not intervening changes in sentencing law.

V

In closing, Jenkins argues that the district court abused its discretion by failing to consider in combination the various grounds he had asserted. Jenkins is correct that factors may sometimes become extraordinary and compelling when considered together. *See* U.S.S.G. § 1B1.13 cmt. n.1(D). And here the district court did not explicitly address the combined weight of Jenkins' arguments. Still, the court did not abuse its discretion. It correctly determined that Jenkins' arguments

about the intervening changes in sentencing law were legally irrelevant to the compassionate-release determination. That left only arguments about his own health and family circumstances. The court reasonably found that these circumstances were minimally significant, so it did not need to say explicitly that their combined force did not rise to the level of extraordinary and compelling circumstances.

## VI

The district court properly denied Jenkins' motion for compassionate release.

*Affirmed.*

GINSBURG, *Senior Circuit Judge*, concurring in part, dissenting in part, and concurring in the judgment:  Although I agree with the result in this case, I write separately because I believe the Court errs in some of its analyses.

## I.  The Narrowed Stacking Provision

Had Jenkins been convicted and sentenced for both of his charges under 18 U.S.C. § 924(c), he would have faced a mandatory 30-year prison sentence under the then-applicable "stacking" provision.  18 U.S.C. § 924(c)(1)(C)(i)(2012).  The First Step Act has since narrowed the stacking provision prospectively, however, such that his two § 924(c) charges would now lead to a mandatory 10-year sentence.  *See* First Step Act, § 403(a), 132 Stat. 5194, 5221–22 (codified at 18 U.S.C. § 924(c)(1)(C)).  This discrepancy, Jenkins contends, helps support a finding of "extraordinary and compelling reasons" that warrant a reduction in his sentence under the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A)(i).  This argument implicates the question whether a non-retroactive change to the law can ever be considered an "extraordinary and compelling reason[]," a question that has divided the courts of appeal.  The Court today joins those courts that have answered the question in the negative.  The Court's arguments notwithstanding, I would not adopt a rule that categorically precludes consideration of a non-retroactive change in the law.  I nevertheless agree that the narrowed stacking provision does not establish "extraordinary and compelling reasons" in the circumstances Jenkins presents.

### A.  Merits of the Court's Reasoning

Central to my disagreement with the Court's reasoning is that the statute provides no basis for categorically precluding consideration of a non-retroactive change to the law.  The statute does not define the term "extraordinary and compelling," and I see no reason to impose upon it a categorical

exclusion. The Congress well knows how to preclude consideration of certain factors. That is exactly what it did when it stated that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). But that is the only limit the Congress placed upon the term. "In light of [this] specific statutory exclusion," I am "reluctant to infer that Congress intended" categorically to exclude the consideration of a non-retroactive change to the law. *United States v. Ruvalcaba*, 26 F.4th 14, 26 (1st Cir. 2022) (citation omitted).

The Court dismisses this straightforward, textualist point by asserting that it is the ordinary practice to apply new, lower penalties only prospectively, and "what the Supreme Court views as the 'ordinary practice' cannot also be an 'extraordinary reason' to deviate from that practice." Ct. Op. at 15 (cleaned up). Likewise, the Court asserts that "common practice" can never be a compelling reason. *Id.* The Court has thus committed the Fallacy of Division — assuming what is true of the whole must be true of each part. Just because the general practice of applying new penalties only prospectively is "ordinary" or "common" does not mean that a non-retroactive change in the law can never so much as contribute to a finding of "extraordinary and compelling reasons" even after considering the idiosyncratic circumstances of a particular defendant. A compassionate release motion requires a district court to "assess interactions among a myriad of factors" as part of an "individualized consideration of a defendant's circumstances," and because judges are not soothsayers, they cannot possibly "predict how this mix of factors — including non-retroactive changes in sentencing law — will play out in every case." *Ruvalcaba*, 26 F.4th at 27.

Following the lead of some other circuits, the Court further says that allowing a district court to consider a non-retroactive

change to the law "would usurp these quintessentially legislative judgments" not to make laws retroactive. Ct. Op. at 16. That claim would be quite formidable had anyone argued that a non-retroactive change in the law should always, or even often, be considered an "extraordinary and compelling" reason for a sentence reduction. But no one has made that argument. The contrary approach simply contends that a district judge should have the discretion to consider a non-retroactive change to the law as part of an individualized assessment of a defendant's unique circumstances. This is particularly relevant to a change that reflects a societal decision that the conduct for which the prisoner was convicted incurs less moral opprobrium than it previously had. Under that reasonable approach, cases in which legislative change contribute to "a finding of 'extraordinary and compelling reasons' should be relatively rare." *United States v. Maumau*, 993 F.3d 821, 838 (10th Cir. 2021) (Tymkovich, J., concurring). "[A]llowing for the provision of individual relief in the most grievous cases" does not in any way usurp the legislative determination of the Congress to eschew "automatic vacatur and resentencing of an entire class of sentences" and the attendant logistical nightmares. *United States v. McCoy*, 981 F.3d 271, 286–87 (4th Cir. 2020).

I am equally unmoved by the Court's suggestion that my reading of the statute is inconsistent with that of the Sentencing Commission. Although I agree with the Court's conclusion that a district judge does not abuse his or her discretion by looking to section 1B1.13 of the Sentencing Guidelines and its commentary as "persuasive" authority, I think the Court assigns the policy statement of the Guidelines more weight than a fair reading of our decision in *United States v. Long* can support. 997 F.3d 342 (2021). The Court asserts:

> [T]he Act's sole change was to create a new procedural avenue for relief. It did not alter the extraordinary-and-compelling-reasons standard, so it did not undermine the Commission's interpretation of that standard.

Ct. Op. at 11–12. The Court contends that this proceduralist reading of the First Step Act is consistent with our decision in *Long*, as there "we did not consider[] the distinct question whether courts may rely on" the Sentencing Commission's interpretation of the standard "as persuasive authority." Ct. Op. at 12.

To the contrary, *Long* did much to undermine the Commission's interpretation of the standard, at least as applied to a motion filed by a prisoner. In *Long* we first explained that the change the First Step Act made to the compassionate release statute (allowing a prisoner to file a motion on his or her own behalf) was spurred by the Congress's displeasure with the Bureau of Prisons' sparing use of that statute, as evidenced by the title of the relevant section of the Act: "Increasing the Use and Transparency of Compassionate Release." 997 F.3d at 348. Later, in explaining why the policy statement of the Sentencing Guidelines did not apply to a motion filed by a prisoner, the court stated that "[a]ny change by Congress to the substantive reach of the statutory sentencing scheme may rightly be expected to result in a change to the policy statements guiding those statutes' implementation." *Id.* at 356. Thus, the *Long* court held that the policy statement was of limited value for interpreting the scope of "extraordinary and compelling reasons" as applied to a motion filed by a prisoner, as opposed to one filed by the Bureau of Prisons, because the Congress had evinced an intent to expand use of compassionate release, and the Sentencing Commission could be expected to update its Guidelines to bring them into alignment with the

Congress's more permissive attitude. In other words, the change to the statute was not a mere procedural change, as the Court would have us believe; it was a "paradigm shift," and "[i]t would blink reality to assume that the Sentencing Commission would think that the only modifications necessary to the existing policy statement would be to disregard the references to motions brought by the" Bureau of Prisons. *Ruvalcaba*, 26 F.4th at 22.

The Supreme Court's opinion in the recent case of *Concepcion v. United States* buoys my conviction that the statute should not be read as barring the district court from considering a non-retroactive change in the law. 142 S. Ct. 2389 (2022). In *Concepcion*, the Supreme Court lauded the "venerable tradition of discretion" in sentencing and sentence-modification proceedings. *Id.* at 2401 n.4. Based upon that tradition, the Supreme Court cautioned the lower courts against reading exceptions into statutes dealing with the discretion of judges to consider information during sentencing or sentence-modification proceedings. "The only limitations on a court's discretion to consider any relevant materials . . . are those set forth by Congress in a statute or by the Constitution." *Id.* at 2400.

To be sure, unlike the Supreme Court in *Concepcion*, we are not dealing here with an implied exception to a judge's discretion; the question, rather, is the scope of the phrase "extraordinary and compelling reasons." But the same tradition that gave rise to *Concepcion*'s admonition against creating non-explicit exceptions to a judge's discretion counsels against a parsimonious reading of the statute at hand. The Court's reasoning is profoundly inconsistent with the Supreme Court's teaching in *Concepcion.* The Congress has created only two relevant limitations that control the district courts' reading of the standard: One for controlling Sentencing

Commission policy statements, and the other for "[r]ehabilitation . . alone." 28 U.S.C. § 994(t). Because the "Congress has not legislated to create a third limitation on extraordinary and compelling reasons prohibiting district courts from considering non-retroactive changes in sentencing law, we" should "decline to create one now." *United States v. Chen*, No. 20-50333, 2022 WL 4231313, at *6 (9th Cir. Sept. 14, 2022) (relying upon *Concepcion*, 142 S. Ct. at 2396).

## B. Alternative Ground

Despite my disagreement with the Court's reasoning, I agree that Jenkins's argument based upon the narrowing of the stacking provision does not support a finding of "extraordinary and compelling reasons" in this case. Because Jenkins pleaded guilty and was sentenced for only one § 924(c) charge, he was not sentenced under the stacking provision. Therefore, Jenkins argues that the plea negotiations were tainted by the possibility of being sentenced under the then-existing stacking provision, which caused him to enter a harsher plea agreement than he otherwise would have done. This is of a piece with the argument Jenkins made based upon *Borden v. United States*, regarding the 15-year mandatory minimum in the Armed Career Criminal Act. 141 S. Ct. 1817 (2021). The Court's treatment of the *Borden* issue, in Part IV.C, is therefore sufficient to decide the issue presented by the narrowing of the stacking provision. Finding myself in agreement with the Court's treatment of the *Borden* issue, I also agree that the narrowing of the stacking provision does not support a finding of "extraordinary and compelling" circumstances in this case.

## II. Winstead Argument

In *United States v. Winstead*, we held that an inchoate offense does not qualify as a predicate offense for career

offender status under the Sentencing Guidelines. 890 F.3d, 1082, 1091 (2018). Had that standard been applied to Jenkins, he would not have been considered a career offender. In a pre-*Winstead* world, however, Jenkins and the Government both assumed his inchoate offenses were predicate offenses and that he therefore was a career offender. This assumption had a tangible effect upon Jenkins's sentence. As the district judge acknowledged, Jenkins's "exposure to a significantly higher Guidelines range due to his then-undisputed status as a career offender was apparently a significant factor behind . . . the agreed sentence presented to the Court." ECF Doc. 42, 9–10 (cleaned up).

Jenkins argues that having been sentenced under the assumption he was a career offender helps support a finding of "extraordinary and compelling reasons." His argument presents the question whether a change in the legal landscape established by an intervening judicial decision can ever support a finding of "extraordinary and compelling reasons." The Court answers no for two reasons, both of which I find wanting: (1) This type of change is neither extraordinary nor compelling; and (2) even if a claim based upon this type of change literally fits the words of the statute, the "habeas-channeling" rule set forth in *Preiser v. Rodriguez*, recognizes an implicit exception for such claims. 411 U.S. 475, 489–90 (1973). Because I disagree with these reasons, I would not announce a categorical rule precluding the consideration of a *Winstead* argument, or any similar argument based upon a judicial ruling, in assessing whether there are "extraordinary and compelling reasons" that warrant compassionate release. I nevertheless agree that under the circumstances presented by Jenkins, his *Winstead* argument does not help establish "extraordinary and compelling reasons" for compassionate release.

My disagreement with the Court's first reason, that a change to the legal landscape established by judicial decision is never an "extraordinary and compelling" reason largely tracks my disagreement with the Court's similar conclusion regarding non-retroactive changes in the law. My comments here are therefore confined to the Court's second reason — that the habeas-channeling rule precludes consideration of Jenkins's *Winstead* argument — and to explaining why I nevertheless would reject Jenkins's *Winstead* argument.

The Court's second argument is wrong for two reasons: (1) the Government forfeited this argument, and (2) even if it had not, the habeas-channeling rule, properly understood, does not apply to motions for compassionate release.

## A. Forfeiture

"[T]he habeas channeling rule . . . can be forfeited if a defendant fails to assert it." *Dufur v. United States Parole Comm'n*, 34 F.4th 1090, 1095 (D.C. Cir. 2022). There is no doubt the Government failed to assert it before the district court, so it is forfeit. The Court, however, says that because the Government raised the argument before us in its Memorandum of Law and Fact and Jenkins failed to argue forfeiture in his Reply Memorandum of Law and Fact, he forfeited the forfeiture.

The Court sees in the Government's Memorandum of Law and Fact far more than I can find there. The Court points to pages 21–22 where, after having argued that Jenkins's claims do not establish "extraordinary and compelling reasons," the Government concluded: "Instead . . . appellant's remedy is to file a motion pursuant to 28 U.S.C. § 2255, challenging the validity of his decision to plead guilty and resulting sentence." Fairly read, all that says is that because sentencing error, in the

view of the Government, is not an "extraordinary and compelling" reason, Jenkins's only recourse is a § 2255 proceeding. That is not the habeas-channeling argument, which, as explained below in Part II.B, asserts that even if a change in the law made by a judicial decision fits the terms of the compassionate release statute, it is implicitly excluded therefrom. Indeed, the Government's memorandum makes no mention of *Preiser* or any of the other seminal cases upon which the habeas-channeling rule is based. Their conspicuous absence makes perfectly clear what the Government did and did not argue.

The several citations that follow the Government's statement of its position reinforces this point. One of those cases, *Ivy v. Pontesso*, is completely irrelevant, as it deals with the availability of relief for a federal prisoner under § 2241 as opposed to § 2255. 328 F.3d 1057, 1059 (9th Cir. 2003). The other cases make not a single mention of the habeas-channeling rule or any of the cases that expound upon it. Rather, the cited cases mention habeas relief to the same end as does the Government, namely, to make the point that for legal claims that are not "extraordinary and compelling" as a matter of law, a prisoner's only recourse is in a § 2255 proceeding.

The Court also asserts (in a footnote) that certain wording in the district court's opinion "fairly includes" the habeas-channeling argument and thus "teed the issue up in this court." Ct. Op. at 23–24 n.2. All the district court said, however, was that "the compassionate release statute was not intended to serve as a second chance to address a defendant's sentence." What follows that broad statement is a quotation from another opinion rejecting the use a non-retroactive legislative change to support a finding of "extraordinary and compelling reasons," an issue to which the habeas-channeling rule does not apply. Indeed, throughout its opinion, the district court deals with

*Winstead* and legislative changes as presenting the very same issue. Clearly, then, all the district court meant in the above-cited passage was that neither a claim based upon *Winstead* nor a claim based upon legislative change can ever fit into the wording of the compassionate release statute. Nary a whiff of the habeas-channeling argument is to be found in this passage or anywhere else in the district court's opinion.

"In our adversarial system of adjudication, we follow the principle of party presentation." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020). While "[t]here are no doubt circumstances in which a modest initiating role for a court is appropriate," by adding a wholly new argument to the Government's presentation on appeal, the Court exceeds its modest role as an "essentially passive instrument[] of [the parties]." *Id.*

In short, the Government forfeited any habeas-channeling argument, and a fair reading of the Government's Memorandum of Law and Fact provides no basis for concluding that Jenkins' forfeited the Government's forfeiture.

## B. Merits of the Habeas-Channeling Argument

Worse yet, the habeas-channeling argument is also plain wrong. In adopting it, the Court makes a grave mistake. The habeas-channeling rule simply does not apply to claims such as Jenkins's under the compassionate release statute.

The habeas-channeling rule made its debut in *Preiser v. Rodriguez*. There, the Supreme Court held that state prisoners alleging the unconstitutional deprivation of their good-time credits could seek redress only under the federal habeas corpus statute applicable to state prisoners, 28 U.S.C. § 2254, and not under the Civil Rights Act of 1871, 42 U.S.C. § 1983. 411 U.S.

at 489. "Despite the literal applicability of [§ 1983's] terms" to the prisoners' claim, *id.*, the *Preiser* Court found "an implicit exception from § 1983's otherwise broad scope for actions that lie 'within the core of habeas corpus.'" *Wilkinson v. Dotson*, 544 U.S. 74, 79 (2005) (quoting *Preiser*, 411 U.S. at 487). Claims that involve "an attack by a person in custody upon the legality of that custody" are therefore excluded from the scope of § 1983. *Preiser*, 411 U.S. at 484.

This implied exception is rooted in the significant overlap between the federal habeas statute and § 1983. While § 1983 creates a general cause of action for "the deprivation [under the color of state law] of any rights, privileges, or immunities secured by the Constitution and laws," 42 U.S.C. § 1983, the federal habeas statute deals with the similar but more specific situation of a state prisoner who claims that "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254. This overlap created a conflict: The habeas statute requires the exhaustion of state remedies, but § 1983 does not, so authorizing overlapping § 1983 suits would practically nullify the habeas statute's exhaustion requirement. *Preiser*, 411 U.S. at 489–90. Given this conflict and the relative specificity of the habeas statute, the Supreme Court held that when a state prisoner attacks the legality of his confinement and "seeks a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus." *Id.* at 500.

To state the rule is to see why it does not apply to a *Winstead* argument. A prisoner making that argument is not claiming his sentence is "invalid" or "unlawful." Rather, the prisoner concedes, at least for the purpose of his motion for compassionate release, that the sentence is currently valid and lawful, but nevertheless appeals to the equitable discretion of

the judge for a sentence modification. *See United States v. Trenkler*, 47 F.4th 42, 2022 WL 3711709, at \*4 (1st Cir. 2022) ("[H]abeas and compassionate release are distinct vehicles for relief."). Therefore, a motion for compassionate release, even one based upon *Winstead*, does not go to the "core of habeas," which is to "claim[] the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a).

The Court says this is wrong because, "[a]s a 'judicial construction' of the career offender guideline, *Winstead* establishes what that guideline meant 'before as well as after' the date it was decided." Ct. Op. at 18 (quoting *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 312 (1994)). But the question whether a judicial construction has retroactive effect is irrelevant to Jenkins's argument. His argument does not rest upon the contention that the sentencing judge committed a legal error. Rather, in his motion for compassionate release, he asks the judge, in the exercise of her discretion, to consider the discrepancy between his sentence and a sentence he would receive were he resentenced under current law. In this respect, an argument based upon *Winstead* is no different from an argument based upon a legislative change. *See United States v. Hunter*, 12 F.4th. 555, 565 (6th Cir. 2021) (explaining that changes based upon judicial decisions and legislative changes are conceptually the same with respect to a motion for compassionate release). In other words, even if, contrary to *Rivers,* judicial opinions did not apply retrospectively, Jenkins still would have made the same argument: That he would have received a lower sentence had he been sentenced after the *Winstead* decision, rather than before it, helps establish grounds for a sentence reduction.

In any event, with respect to the habeas-channeling rule, the only retroactivity that could matter is retroactivity with

respect to a habeas petition. This is not the place for an extended treatment of whether *Winstead* applies retroactively to a habeas petition. Suffice it to say that it is far from clear that it satisfies the demanding requirements for retroactivity set forth by *Teague v. Lane*, 489 U.S. 288 (1989). The Court does not even attempt to show that it does, although the Court's reliance upon the retroactivity of judicial opinions is meaningless without that showing.

Finally, as mentioned above, the habeas-channeling rule of *Preiser* is based upon the "implicit [habeas] exception" to § 1983. *Wilkinson*, 544 U.S. at 79. The Court in effect argues that the compassionate release statute includes a similar implicit exception. The Supreme Court has never applied the habeas-channeling rule to a non § 1983 case. This court has done so, *see Davis v. U.S. Sentencing Commission*, 716 F.3d 660, 662–63 (2013); *Skinner v. DOJ*, 584 F.3d 1093, 1099 (2009), but not when dealing with a statute expressly designed to give judges the discretion to modify sentences. Reading an implicit habeas exception into "a statute whose very purpose is to open up final judgments," *Concepcion*, 142 S. Ct. at 2398 n.3, is a far cry from what the Supreme Court did in *Preiser*. It also runs afoul of *Concepcion*'s clear admonition against reading a limitation into a statute providing judges with sentencing discretion. 142 S. Ct. at 2400.

## C.  Alternative Grounds

Despite my misgivings about the Court's reasoning, I agree that Jenkins's *Winstead* argument does not support a finding of "extraordinary and compelling reasons" in his circumstances. Without career-offender status, the Guidelines' range for the two offenses to which Jenkins pleaded guilty would have been seven to seven-and-one-half years. Jenkins was instead sentenced to eight years. Because the other reasons

he provided (his health and his need to care for his mother) are legally insignificant and the discrepancy in his sentence is modest, I do not believe Jenkins has presented "extraordinary and compelling reasons" for early release. Although I believe the district judge erred, and hence abused her discretion, by concluding that she was not permitted even to consider Jenkins's *Winstead* argument, remanding the case to her would be pointless, as she would inevitably reach the same conclusion even if she applied what I believe to be the correct standard.

### III. Conclusion

This case should never have come before us. Had the Sentencing Commission not been left without a quorum for years, it would by now have published a policy statement providing guidance on the relevant questions. In a long overdue development, the Senate recently confirmed seven nominees to the Commission, allowing it to resume the important work for which the Congress created it. I look forward to the Commission soon clearing up the confusion wrought by the protracted absence of a quorum.

As explained above, I respectfully dissent from much of the Court's reasoning and the broad implications that flow from it, but I concur in the judgment of the Court because Jenkins's specific circumstances do not support a finding of "extraordinary and compelling reasons" that warrant a reduction of his sentence.